UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
WES&A HOLDINGS, LLC, and WASTE          :
EXPRESS, INC.,
                                        :
                        Plaintiffs,            **OPINION AND ORDER**
                                        :
           -against-                           10 Civ. 3865 (KNF)
                                        :
NICHOLAS J. MALINO, ROBERT T.
ROEVER, and CAPITOLINE ADVISORY  :
GROUP INC.,
                                        :
                        Defendants.
-----------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

      This is an action for damages, brought pursuant to the court's diversity jurisdiction,

28 U.S.C. § 1332, and for a declaratory judgment, pursuant to 28 U.S.C. § 2201.  WES&A

Holdings, LLC ("WES&A") asserted: (1) causes of action for common-law breach of fiduciary

duty, allegedly owed to Amerex Group, Inc. and Amerex Companies, Inc. by defendants

Nicholas J. Malino ("Malino") and Robert T. Roever ("Roever"); (2) voidable transfer claims,

under the Oklahoma Uniform Fraudulent Transfer Act ("UFTA"), Okla. Stat. tit. 24, §§ 112-123,

against Malino and Capitoline Advisory Group Inc. ("Capitoline"); and (3) causes of action for

common-law contribution, against Malino and Roever.  Through the first amended complaint,

WES&A and Waste Express, Inc., also seek a judgment declaring Malino and Roever jointly and

severally liable to the Internal Revenue Service ("IRS") "for the assessed taxes and statutory

additions of $154,817.90 stemming from unpaid taxes of Waste Express, Inc. incurred in tax

years 2005 and 2007 and the first 6 months of 2008, less any abatement granted by the IRS"; and

a judgment in favor of WES&A, declaring Malino and Roever "jointly and severally liable to the

States of Oklahoma, Connecticut and Oregon for the assessed taxes and statutory additions of $54,969.88, stemming from unpaid taxes of Amerex, Inc. incurred in tax years 2006 and 2007 and the first 6 months of 2008, less any abatement granted by the States tax authorities."

According to the complaint, Roever was a director and Malino the chief executive officer ("CEO") and a director of Oklahoma corporations, Amerex Group, Inc. and its wholly-owned subsidiary Amerex Companies, Inc.  The plaintiffs alleged that Waste Express, Inc. was a wholly owned subsidiary of Amerex Companies, Inc. until about August 24, 2009, when Amerex Group, Inc., Amerex Companies, Inc. and Waste Express, Inc. agreed to the terms of a non-judicial foreclosure with CAMOFI Master LDC ("CAMOFI"), an institutional investor that lent funds to Amerex Companies, Inc., and WES&A as CAMOFI's designee, and, as a result, Waste Express, Inc. became a wholly-owned subsidiary of WES&A.  WES&A is alleged to be a Missouri limited liability company and Waste Express, Inc. a Missouri corporation.

Pursuant to 28 U.S.C. § 636(c), the parties consented to having a non-jury trial of this action, presided over by a United States magistrate judge.  The trial was conducted on November 19, 20 and December 14, 2012.  Thereafter, the parties submitted post-trial proposed findings of fact and conclusions of law.  The following are the Court's findings of fact and conclusions of law, made pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

WES&A is a limited liability company owned by CAMOFI, the master fund of CAM Opportunity Fund.  Richard Smithline ("Smithline") is CAMOFI's director and the CEO of Centrecourt Asset Management ("Centrecourt").  WES&A was formed in September 2009 to hold the assets of Amerex Group, Inc. and Amerex Companies, Inc.  CAMOFI was Amerex Companies, Inc.'s senior secured lender.

2

Smithline formed Centrecourt in 2004.  Centrecourt served as CAM Opportunity Fund's investment advisor.  As Centrecourt's CEO, Smithline reviewed and approved all CAMOFI's investments before they were made.  In 2005, Smithline met Roever, who was introducing companies to institutional investors in exchange for a fee.  Smithline introduced Roever to Jeff Hass ("Hass"), a portfolio manager.  Roever informed Smithline and Hass that he was raising funds on behalf of Amerex Companies, Inc., a privately held company based in Tulsa, Oklahoma.  Amerex Companies, Inc. was to be a holding company for several waste management companies.  Centrecourt performed due diligence on CAMOFI's behalf regarding Amerex Companies, Inc.  As part of the due diligence process, Centrecourt gave Roever a list of due diligence requests; in response, a 600-page due diligence binder was provided.

The due diligence binder listed Rick Coody ("Coody") as "Chairman," Malino as CEO, and Ron Brewer as chief operating officer of Amerex Companies, Inc.  Craig McMahon was listed as a vice president of operations and Roever was listed as a director.  The due diligence binder indicated that Amerex Companies, Inc. engaged Capitoline to act as its exclusive financial advisor. Roever has been the president of Capitoline since 2003.  The agreement between Amerex Companies, Inc. and Capitoline provided that Amerex Companies, Inc. would pay Capitoline a fee of 10% of any financing obtained from prospects introduced to Amerex Companies, Inc. by Capitoline, as well as reimburse Capitoline for all out-of pocket expenses incurred under the agreement.

Malino entered into an employment agreement with Amerex Companies, Inc. on August 4, 2006, by which Amerex Companies, Inc. appointed Malino as its CEO, at a $15,000 monthly salary, and agreed that Malino would "be paid normal pre-approved expenses relating to travel, meeting attendance, sales efforts as may be required during the term."

3

On November 21, 2005, CAMOFI and Amerex Companies, Inc. signed a note entitled "10% Senior Secured Convertible Note Due November 21, 2007," (the "2005 Note") by which Amerex Companies, Inc. promised to pay CAMOFI, on or before November 21, 2007, $6,000,000, the principal advanced by CAMOFI, and to pay interest to the holder of the note on the aggregate, unconverted and then-outstanding principal amount of the note. The 2005 Note provided that all overdue, accrued and unpaid interest would be paid at the rate of 20% per annum, or such lower maximum amount of interest permitted to be charged under applicable law. Section 7 of the 2005 Note provides:

> So long as any portion of this Note is outstanding, [Amerex Companies, Inc.] will not permit any of its Subsidiaries to directly or indirectly: a) enter into, create, incur, assume or suffer to exist any indebtedness or liens of any kind (other than indebtedness in an aggregate amount of no more than $450,000 and liens, each in favor of the PTF to the extent such indebtedness and liens are existing as of the date hereof), on or with respect to any of its property or assets now owned or hereafter acquired or any interest therein or any income or profits therefrom that is senior to or pari passu with, in any respect or subordinated to (unless on terms satisfactory in all respects to the Investor), [Amerex Companies, Inc.'s] obligations under the Notes. . . . d) engage in any transactions with any officer, director, employee or any affiliate of [Amerex Companies, Inc.], including any contract, agreement or other agreement providing for the furnishing of services to or by, providing for rental or real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee . . . in each case in excess of $10,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of [Amerex Companies, Inc.] and (iii) for other employee benefits, including stock option agreements under any stock option plan of [Amerex Companies, Inc.].

CAMOFI advanced $2.5 million to Amerex Companies, Inc. on November 21, 2005. Subsequently, Amerex Companies, Inc. acquired certain assets, including property in Pryor, Oklahoma (the "Kaiser Facility"). In July 2006, Amerex Group Inc. became a public company and made various filings with the Securities and Exchange Commission ("SEC").

On August 31, 2006, Amerex Companies, Inc. entered into a loan agreement (the "2006

4

Agreement") with CAMOFI, through which CAMOFI agreed to advance up to $1.5 million to Amerex Companies, Inc. pursuant to the terms described in a Revolving Credit Note (the "Revolver Note"), which provided for mandatory repayment of CAMOFI's loan by Amerex Companies, Inc. The Revolver Note was secured by Amerex Companies, Inc.'s accounts receivable. The 2006 Agreement provided that all Amerex Companies, Inc.'s customers would be directed to remit invoice payments into Amerex Companies, Inc.'s account called the "Controlled Account," referred to by Amerex Companies, Inc. and CAMOFI as the "lock box." Under the terms of the 2006 Agreement and the Revolver Note, the funds in the Controlled Account belonged to CAMOFI. Thereafter, Amerex Companies, Inc. provided Centrecourt, on a regular basis, a list of expenses to be paid. Centrecourt, on behalf of CAMOFI, reviewed the list and released funds from the Controlled Account to Amerex Companies, Inc.'s operating bank account.

After Amerex Group Inc. became public, Hass had primary responsibility for overseeing the 2005 Note on behalf of CAMOFI. He was assisted by Centrecourt's chief financial officer, Richard Edelson ("Edelson"). Edelson communicated regularly with Amerex Companies, Inc. about requests for additional funding and the release of funds from the Controlled Account. Roever, who remained a director when Amerex Group Inc. became public, served as the main liaison to CAMOFI. He provided updates on how Amerex Companies, Inc. was doing from time to time. He also visited Centrecourt's office and met regularly with Hass to discuss Amerex Companies, Inc.

By the end of 2006, Amerex Companies, Inc. had defaulted on certain nonfinancial covenants. In January 2007, Roever and Malino informed Centrecourt that Amerex Companies, Inc. could not make monthly interest payments on the 2005 Note. In the first half of 2007,

CAMOFI continued to lend funds to Amerex Companies, Inc., under the 2006 Agreement.  In the spring of 2007, Amerex Companies, Inc. filed a form 10-KSB with the SEC for the year ending December 31, 2006, disclosing that: (a) it failed to pay certain payroll taxes to the IRS during 2006; (b) as of December 31, 2006, it owed approximately $455,000 in tax arrears and $130,000 in estimated penalties and interest; and (c) the IRS had placed a lien on Amerex Companies, Inc.'s assets.

Amerex Group, Inc. obtained a $750,000 loan in August 2007, from Professional Offshore Opportunity Fund, Ltd. ("PROOF").  On or about August 16, 2007, Amerex Group, Inc. filed a form 8-K with the SEC, disclosing this transaction.  CAMOFI did not approve the transaction.  On September 19, 2007, Malino received $50,000 from Amerex Companies, Inc., which reimbursed him for expenses incurred during the period from August 1 through December 31, 2006.  Capitoline received $50,000 on August 17, 2007, and $50,000 in September 2007, which were payments for Capitoline's outstanding contractual fees and expenses owed to it by Amerex Companies, Inc.

On December 19, 2007, CAMOFI and Amerex Companies, Inc. entered into a letter agreement (the "2007 Letter Agreement"), through which CAMOFI agreed to extend the maturity date on the 2005 Note from November 21, 2007 to November 21, 2010, and to defer interest payments until April 1, 2008.  On December 20, 2007, an e-mail message from Brad Morris, Amerex Companies, Inc.'s comptroller, to Stephen K. Onody, one of Amerex Companies, Inc.'s directors, revealed that payroll taxes had not been paid.  Shortly afterwards, CAMOFI was notified about the failure to pay taxes.

Centrecourt engaged an independent consulting firm, the Durkin Group, to review Amerex Companies, Inc.'s financial condition.  The Durkin Group visited Amerex Companies,

Inc.'s main office in Tulsa and issued a report in January 2008. The Durkin Group confirmed that Amerex Companies, Inc. did not pay state payroll taxes in 2007, or federal payroll taxes for the period October through December 2007. Subsequently, Amerex Companies, Inc. defaulted on certain covenants in the 2007 Letter Agreement.

In May 2008, Smithline recommended an independent restructuring advisor, Glenwood Capital, LLC ("Glenwood"), to Amerex Group, Inc. Randall Humphreys ("Humphreys") was a managing director of Glenwood. Roever objected to Glenwood's monthly fee of $37,500 as being too high. Retaining Glenwood was one of CAMOFI's conditions for extending additional funding to Amerex Companies, Inc. Amerex Group, Inc. engaged Glenwood on a monthly basis. On May 21, 2008, Humphreys participated telephonically in Amerex Companies, Inc.'s board of directors meeting. He informed the board about the financial issues faced by Amerex Companies, Inc., including Glenwood's estimate that it owed over $500,000 in tax arrears.

On June 9, 2008, Amerex Group, Inc. and CAMOFI entered into a letter agreement ("the "2008 Letter Agreement"). The 2008 Letter Agreement indicated that the outstanding principal of the 2005 Note was $5,141,648, and the obligation on the Revolver Note was $1,925,301. On July 10, 2008, Malino resigned as Amerex Group, Inc.'s CEO. Roever remained as its director.

Subsequently, Amerex Companies, Inc. entered into an amended Securities Purchase Agreement and the Second Amended and Restated 12% Senior Secured Convertible Note (the "2008 Second Amended Note") with CAMOFI. On November 13, 2008, CAMOFI provided $28,731.47 to Amerex Companies, Inc. for it to participate in a tax amnesty program run by Oklahoma State and to reduce interest and penalties.

In 2009, CAMOFI decided to foreclose on its collateral. On August 24, 2009, Amerex Group Inc., Amerex Companies, Inc., Waste Express, Inc., CAMOFI, as a Lender, and WES&A,

as CAMOFI's designee, entered into an agreement (the "2009 Agreement").  The 2009

Agreement, governed by New York law, provided that Amerex Companies, Inc. shall:

> (i) Convey to Lender (or its designee) its entire interest in the Real Estate and all property related thereto and used in connection therewith, whether personal, real, or mixed, subject only to the encumbrances recited herein . . .;
> (ii) Convey to Lender its interest in the Personal Property pursuant to the Bill of Sale, Blanket Transfer and Assignment in the form attached hereto as Exhibit B . . . .;
> (iii) Assign all of its rights, title and interest in all contracts, leases and agreements (the "Contracts") identified on Exhibit C pursuant to the Assignment and Assumption Agreement in the form annexed hereto as Exhibit D. . . .;
> (iv) Transfer to Lender (or its designee) all books, records, keys and other property, contracts and documentation relating to the Property (which information shall be made available to Lender for review prior to the closing) . . . .;
> (v) Transfer to Lender (or its designee) the Stock, in accordance with the form of stock transfer agreement attached hereto as Exhibit E; and
> (vi) Transfer to Lender (or its designee) exclusive possession and control of the Property.

The 2009 Agreement's Bill of Sale, Blanket Transfer and Assignment Agreement among

"Assignor," Amerex Companies, Inc. and Waste Express, Inc., and "Assignee," WES&A "as

designee of CAMOFI," provides that Assignor

> ASSIGN, GRANT, BARGAIN, SELL, TRANSFER, CONVEY, CONFIRM AND DELIVER unto Assignee all of Assignor's right, title and interest in and to the personal property, contracts and interests (the "Personal Property") being used in connection with the ownership, use and operation of the real estate described on Exhibit A attached hereto and improvements thereon and made a part hereof (the "Property"), including without limitation those items specifically identified on the schedule attached hereto as Exhibit B . . . .

The 2009 Agreement's Bill of Sale, Blanket Transfer and Assignment Agreement also includes a

list of fourteen categories of various rights transferred by Assignor to Assignee.  In September

2009, WES&A was formed as a limited liability company to hold any assets received through the

foreclosure.

8

The IRS sent Amerex Companies, Inc. notices of levy, dated September 17, 2009, indicating that it would levy $509,889.80, for unpaid taxes and statutory additions, and September 18, 2009, indicating that it would levy $509,515.20, for unpaid taxes and statutory additions. Both notices concerned the tax periods ending September 30, 2007, December 31, 2007, March 31, 2008 and June 30, 2008.  Shortly thereafter, the IRS seized $524,482.64, including $506,839.01, from Amerex Companies, Inc.'s accounts receivable — that would otherwise have been paid over to WES&A — and $17,643.63 from Amerex Companies, Inc.'s operating account. From 2005 through 2010, persons other than Roever and Malino served as officers and directors of Amerex.

On or about November 2, 2010, the IRS issued refund checks totaling $170,709.85 to Amerex Companies, Inc., for overpaid interest and penalties.  The IRS kept $353,772.79 it had levied.  According to the IRS, as of December 7, 2011, Amerex Companies, Inc. owed $146,420.73 in unpaid taxes and $7,950.80 in penalties and interest.  As of July 22, 2009, Amerex Companies, Inc. owed $19,774.97 in taxes to Connecticut, including penalties.  As of July 30, 2009, Amerex Companies, Inc. owed Colorado $7,315.80, for taxes and penalties.  As of August 17, 2011, Amerex Companies, Inc. owed $34,257.39. to Oklahoma in unemployment taxes, including penalties and interest.

## CONCLUSIONS OF LAW

### *Standing to Assert a Common-Law Breach of Fiduciary Duty Cause of Action*

In their post-trial proposed findings of fact and conclusions of law, the defendants contend that the plaintiffs lack standing to assert a common-law breach of fiduciary duty cause of action against them because the defendants did not owe a fiduciary duty to the plaintiffs.  A standing argument may not be waived because it implicates a federal court's jurisdiction, and "irrespective

9

of how the parties conduct their case, the courts have an independent obligation to ensure that federal jurisdiction is not extended beyond its proper limits." Wight v. Bankamerica Corp., 219 F.3d 79, 90 (2d Cir. 2000).

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" Clapper v. Amnesty Int'l USA, __ U.S. __, 133 S. Ct. 1138, 1146 (2013). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" Id. (quoting Raines v. Byrd, 521 U.S. 811, 818, 117 S. Ct. 2312, 2317 (1997)).  The requirements of Article III standing are: (1) "an injury that is concrete, particularized, and actual or imminent"; (2) "fairly traceable to the defendant's challenged action"; and (3) "redressable by a favorable ruling."  Horne v. Flores, 557 U.S. 433, 445, 129 S. Ct. 2579, 2592 (2009) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)).  "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents."  Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 77, 111 S. Ct. 1700, 1704 (1991).  "Typically, . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  Allen v. Wright, 468 U.S. 737, 752, 104 S. Ct. 3315, 3325 (1984).  The party invoking the jurisdiction of a federal court "bears the burden of showing that he has standing for each type of relief sought." Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S. Ct. 1142, 1149 (2009).  Since standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Lujan, 504 U.S. at 561, 112 S. Ct. at 2136.

10

### Choice of Law

"[A] federal court exercising diversity jurisdiction generally must apply the choice-of-law rules of the state in which the court sits to determine the rules of decision that would apply if the suit were brought in state court." Liberty Synergistics Inc. v. Microflo Ltd., 718 F.3d 138, 151 (2d Cir. 2013). "It appears that the New York courts would look to the law of the state of incorporation in adjudicating a corporation's 'internal affairs,' including questions as to the relationship between the corporation's shareholders and its directors." Galef v. Alexander, 615 F.2d 51, 58 (2d Cir. 1980) (citations omitted).

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands.
>
> Edgar v. Mite Corp., 457 U.S. 624, 645, 102 S. Ct. 2629, 2642 (1982).

The plaintiffs alleged, in the first amended complaint, that Malino, as an officer and director, and Roever, as a director, "owed Amerex and its shareholders a fiduciary duty," "in connection with their responsibilities as directors and officers of the Amerex Group, Inc. ('Amerex Group') and its wholly-owned subsidiary, Amerex Companies, Inc. ('Amerex, Inc.'; collectively, the companies are referred to as 'Amerex') in 2007 and 2008." When "Amerex became insolvent, such duties were owed to its creditors." According to the first amended complaint, "CAMOFI had standing as a creditor to bring a derivative claim against" Malino and Roever, "for breach of fiduciary duty" because it "gained the right to bring a claim for breach of fiduciary duty by reason of the non-judicial foreclosure effected by the August 24, 2009 Agreement." The plaintiffs asserted that, as a result of the alleged breach of fiduciary duty,

"WES&A, as CAMOFI's designee, has been damaged in an amount to be determined at trial."

In the Joint Pre-trial Statement, the parties agreed that certain facts are undisputed, including that "Amerex Group is an Oklahoma corporation" and "Amerex, Inc. is an Oklahoma corporation."  The parties agreed, in their post-trial proposed findings of fact and conclusions of law that Oklahoma law should govern in this action because Amerex Group Inc. and Amerex Companies, Inc. were Oklahoma corporations with a principal place of business in Oklahoma. Since the parties agree that any alleged fiduciary duty by Roever and Malino was owed to "Amerex and its shareholders," and Amerex Group Inc. and Amerex Companies, Inc. were Oklahoma corporations, the Court finds that Oklahoma law governs WES&A's common-law breach of fiduciary duty causes of action against Malino and Roever.  Moreover, Oklahoma law governs WES&A's statutory voidable transfer claims against Malino and Capitoline, since those claims involve internal affairs related to corporate directors.  See Galef, 615 F.2d at 58.

### *Oklahoma Common-law Breach of Fiduciary Duty Causes of Action Against Malino and Roever*

The standing inquiry requires ascertaining whether WES&A "is entitled to an adjudication of the particular claims asserted," in this case, common-law breach of fiduciary causes of action, Allen, 468 U.S. at 752, 104 S. Ct. at 3325, and WES&A bears the burden of demonstrating its standing to assert its common-law breach of fiduciary duty causes of action under Oklahoma law, see Lujan, 504 U.S. at 561, 112 S. Ct. at 2136.  To answer the question whether WES&A can assert a claim of common-law breach of fiduciary duty that was owed by Malino and Roever to "Amerex and its shareholders" under Oklahoma law, the Court must determine who is "Amerex," who is "WES&A," and the nature of the relationship between "Amerex" and WES&A, if any, which may confer standing on WES&A to assert the common-law breach of fiduciary causes of

12

action in this litigation.  Given that the non-jury trial has been completed, the Court will consider the entire record in answering these questions.

Amerex

In their first amended complaint and the joint pre-trial statement, the plaintiffs use the word "Amerex" to refer collectively to Amerex Group, Inc. and Amerex Companies, Inc.  Although they assert that Amerex Companies, Inc. is a wholly-owned subsidiary of Amerex Group, Inc., the evidence in support of this contention seems to be contradictory, because the plaintiffs' Exhibit No. 42, SEC form 10-KSB for the fiscal year ending December 31, 2007, filed by Amerex Group, Inc. states: (a) Amerex Group Inc. "has one wholly-owned subsidiary–Waste Express, Inc. a Missouri Corporation based in Kansas City, MO"; and (b) "[o]ur industrial waste management services are conducted through Amerex Companies, Inc., an Oklahoma corporation and our wholly-owned subsidiary, which we refer to herein as Amerex."  The evidence shows that Malino was CEO of Amerex Companies, Inc., but his July 10, 2008 resignation letter states he was resigning "as CEO of Amerex Group, Inc.," which is also contended in Amerex Group, Inc.'s SEC form 8-K, dated July 14, 2008.  Notwithstanding the foregoing seeming discrepancies and based on the parties' understanding and reference to Amerex Group, Inc. and Amerex Companies, Inc., separately and in combination, as "Amerex," the Court will use "Amerex" to refer, collectively, to Amerex Group, Inc. and Amerex Companies, Inc.

WES&A

The plaintiffs alleged, in the first amended complaint:

The terms of the Subsidiary Guarantee dated November 21, 2005, and Security Agreement dated November 21, 2005, as amended, provided that under certain circumstances of default, CAMOFI could foreclose upon the assets secured by those agreements.  On August 24, 2009, after Amerex again defaulted on certain material obligations to CAMOFI, Amerex and Waste Express agreed by written agreement (the

"August 24, 2009 Agreement") to convey to CAMOFI or its designee, WES&A, all of its assets. This conveyance included, pursuant to the terms of a Stock Transfer Agreement, all of Amerex, Inc.'s stock in Waste Express, and the assignment by Amerex Group, Amerex, Inc. and Waste Express of all property described in a Bill of Sale, Blanket Transfer and Assignment Agreement, including all rights, title and interest in any causes of action and litigation claims.

The parties contend the following in their joint pre-trial statement of undisputed facts:

The terms of the Subsidiary Guarantee dated November 21, 2005, and Security Agreement dated November 21, 2005, as amended, provided that under certain circumstances of default, CAMOFI could foreclose upon the assets secured by those agreements. On August 24, 2009, after Amerex again defaulted on certain material obligations to CAMOFI, Amerex and Waste Express agreed by written agreement (the "August 24, 2009 Agreement") to convey to CAMOFI or its designee, WES&A, certain of their respective assets. This conveyance included, pursuant to the terms of a Stock Transfer Agreement, all of Amerex, Inc.'s stock in Waste Express, and the assignment by Amerex Group, Amerex, Inc. and Waste Express of all property described in a Bill of Sale, Blanket Transfer and Assignment Agreement, including all rights, title and interest in any causes of action and litigation claims. CAMOFI also assigned to WES&A any claims it may have in its own right.

Although the plaintiffs alleged, in their first amended complaint, that the August 24, 2009 agreement conveyed to "CAMOFI or its designee, WES&A, **all of its assets**, . . . including all rights, title and interest in any causes of action and litigation claims," the joint pre-trial statement provides that the August 2009 Agreement conveyed to "CAMOFI or its designee, WES&A, **certain of their respective assets**" and, additionally, that "CAMOFI also assigned to WES&A any claims it may have in its own right." Thus, the plaintiffs' argument is that their standing to assert a common-law breach of fiduciary duty cause of action under Oklahoma law is based on the rights conveyed by Amerex to WES&A, as Camofi's designee, by the August 2009 Agreement, namely, "the assignment by Amerex Group, Amerex, Inc. and Waste Express of all property described in a Bill of Sale, Blanket Transfer and Assignment Agreement, including all rights, title and interest in any causes of action and litigation claims. CAMOFI also assigned to WES&A any claims it may

have in its own right."

Neither the 2009 Agreement nor the 2009 Agreement's Bill of Sale, Blanket Transfer Assignment Agreement mentions any transfer "to CAMOFI or its designee, WES&A," of "all rights, title and interest in any cause of action and litigation claims," as asserted in the first amended complaint and the joint pre-trial statement, and it does not contain any provision by which "CAMOFI also assigned to WES&A any claims it might have in its own right," as asserted in the joint pre-trial statement.  The evidence in the record does not support the plaintiffs' contentions that Amerex transferred to CAMOFI or its designee, WES&A, "all rights, title and interest in any cause of action and litigation claims," or that "CAMOFI also assigned to WES&A any claims it might have in its own right."

Even assuming that the 2009 Agreement or the 2009 Agreement's Bill of Sale, Blanket Transfer Assignment Agreement conveyed such rights on WES&A, Oklahoma law bars creditors from asserting common-law causes of action for breach of fiduciary duty.  See Resolution Trust Corp. v. Greer, 911 P.2d 257, 264-65 (Okla. 1996) ("[A]ny breach of a non-statutory duty attendant upon [a corporate director's] fiduciary status would belong to the corporation alone, *not to its creditors*.").  Accordingly, since CAMOFI is Amerex's creditor, as is asserted in the complaint and demonstrated by evidence, and WES&A, a holding company for Amerex's assets, is its designee, neither CAMOFI nor WES&A has standing to assert a cause of action for common-law breach of fiduciary duty under Oklahoma law.  The Court finds that WES&A failed to establish standing to assert a cause of action for common-law breach of fiduciary duty against Malino and Roever and those causes of action must be dismissed for lack of standing.

***Oklahoma Voidable Transfer Claims under UFTA Against Malino and Capitoline***

WES&A alleged, in the first amended complaint, that: (1) "[o]n or about September 17,

2007, Amerex made a $50,000 transfer to Malino, a company insider"; (2) "[o]n or about August 17, 2007, Amerex made a $50,000 transfer to Capitoline, the wholly-owned corporation of Roever, a company insider"; and (3) "[o]n or about September 19, 2007, Amerex made a second $50,000 transfer to Capitoline."  According to the complaint: (a) "Amerex did not receive a reasonably equivalent value from Malino and Capitoline in exchange for these transfers"; (b) "Amerex's debts were beyond its ability to pay as they became due"; and (c) Amerex was insolvent "on the date" of the three transfers.  WES&A alleged that $150,000 paid to Malino and Capitoline was "a commission for arranging the PROOF transaction. This meant that the PROOF transaction resulted in Amerex receiving just $600,000 to apply to its obligations."  WES&A seeks to void the three transfers and the return of $150,000.

WES&A contends, in the plaintiffs' post-trial submissions, that Malino and Roever are liable under UFTA's: (1) Section 117(B), because "[t]he parties stipulated that Amerex was insolvent in August and September 2007 . . . and Roever and Malino testified that the transfers were for antecedent debt"; and (2) Section 117(A), because "[e]ven assuming the validity of the antecedent debt, Roever and Malino have not shown that Amerex received any reasonably equivalent value, i.e., new consideration, at the time of the transfer [and] Roever and Malino cannot show that . . . CAMOFI was not worse off due to the transfers, because Amerex could have used the funds from PROOF to meet either its state or federal payroll tax obligations or to pay subcontractors and vendors needed to conduct its ongoing business."  Moreover, the plaintiffs contend, "even if Roever and Malino cannot demonstrate good faith because they were insiders, they concealed the transfers, Amerex was insolvent, the transfers were majority of extra funds raised via the PROOF loan, Amerex received no new value, and the transfers occurred immediately after Amerex incurred substantial new debt with PROOF.  Okla. Stat. tit. 24, §§ 116(B)(1), (3), (5),

(8)-(10) (1986)."

Oklahoma's UFTA

"The purpose of the [UFTA] is to allow a creditor the opportunity to invalidate the transfer of assets made by a debtor if the transfer has the effect of placing assets out of reach of present and future creditors." Burrows v. Burrows, 886 P.2d 984, 988 (Okla. 1994). Section 116 of the UFTA provides:

> A. A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . : 1. with actual intent to hinder, delay, or defraud any creditor of the debtor; or 2. without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor: a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. B. In determining actual intent . . . consideration may be given, among other factors, to whether: 1. the transfer . . . was to an insider; 2. the debtor retained possession or control of the property transferred after the transfer; 3. the transfer . . . was disclosed or concealed; 4. before the transfer was made . . . the debtor had been sued or threatened with suit; 5. the transfer was of substantially all the debtor's assets; 6. the debtor absconded; 7. the debtor removed or concealed assets; 8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ; 9. the debtor was insolvent or became insolvent shortly after the transfer was made . . . 10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and 11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

 Okla. Stat. tit. 24, § 116.


Section 117 of the UFTA provides:

> A. A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. . . . B. A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

17

Okla. Stat. tit. 24, § 117.

"'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Okla. Stat. tit. 24, § 113(3). "'Transfer' . . . includes payment of money." Okla. Stat. tit. 24, § 113(12). "Value is given for a transfer . . . if, in exchange for the transfer . . . property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." Okla. Stat. tit. 24, § 115. If the debtor is a corporation, "insider" includes "a director of the debtor" or "an officer of the debtor." Okla. Stat. tit. 24, § 113(7)(b).

> A. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. B. A debtor who is generally not paying his debts as they become due is presumed to be insolvent. . . . D. Assets pursuant to the provisions of this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable pursuant to the provisions of the [UFTA]. E. Debts pursuant to the provisions of this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

> Okla. Stat. tit. 24, § 114.

Typically, in a civil action, the burden is on the plaintiff to prove by a preponderance of the evidence each element of the plaintiff's claim. See Lore v. City of Syracuse, 670 F.3d 127, 149 (2d Cir. 2012); accord Rogers v. Pennington Grocery Co., 239 P. 126, 127 (Okla. 1925).

Claim Against Malino

WES&A neither alleged in the first amended complaint nor presented at trial any evidence that Malino had the actual intent to hinder, delay, or defraud any creditor of Amerex, as required by UFTA Section 116(A)(1). Since: (a) Amerex's September 19, 2007 payment of $50,000 to Malino

18

represented reimbursement for expenses he incurred during the period August 1 through December 31, 2006; and (b) Malino's employment agreement with Amerex provided for reimbursement of his expenses, the September 19, 2007 payment is not subject to the "receiving a reasonably equivalent value in exchange for the transfer" provision of UFTA's Section 116(A)(2).  Therefore, WES&A failed to establish that Malino is liable to it under UFTA Section 116.  For the same reason, namely, that Amerex's September 19, 2007 payment of $50,000 to Malino was a payment for expenses due him and not subject to the statutory requirement of "receiving a reasonably equivalent value in exchange for the transfer," WES&A failed to establish that Malino is liable to it under UFTA Section 117(A).

WES&A's contention, in the plaintiffs' post-trial submissions, that "[t]he parties stipulated that Amerex was insolvent in August and September 2007," is erroneous because the joint pre-trial statement of undisputed facts states: "Amerex was insolvent throughout nearly all of its existence," and it does not mention August or September 2007, or specify any other time period.  To prevail under UFTA's Section 117(B), WES&A has the burden of showing, by a preponderance of the evidence, that on September 19, 2007, Amerex was insolvent, Okla. Stat. tit. 24, § 117(B) that is, "the sum of the [Amerex's] debts [was] greater than all of [Amerex's] assets at a fair valuation." Okla. Stat. tit. 24, § 114(A).  Moreover, if WES&A shows, by a preponderance of the evidence, that, at the time the payment was made to Malino, Amerex was generally not paying its debts as they became due, it is entitled to a presumption that Amerex was insolvent.  See Okla. Stat. tit. 24, § 114(B).

WES&A presented no evidence showing the sum of Amerex's debts or all of Amerex's assets, as defined by UFTA, or otherwise showing that Amerex was insolvent on September 19, 2007, for the purposes of the UFTA claim.  Malino testified that, at the time it obtained the PROOF

loan, in August 2007, Amerex Companies, Inc.: (a) was operating and revenue was coming in; (b) satisfied various financial obligations; (c) was in the best financial position with respect to cash; and (d) had a lot of prospects, including additional contracts and work that was available and had the potential to generate significant cash flow in the future.  Moreover, he testified that, at the time Amerex paid his expenses on September 19, 2007, he was not aware of any outstanding tax matters because he relied on independent consultants, five or six quarterly reviews and two audits that reported no outstanding tax matters.  The Court finds that Malino's testimony was credible.  Thus, Malino had no reasonable cause to believe that Amerex was insolvent on September 19, 2007, and he made certain that its financial obligations were satisfied before the payment reimbursing his expenses was made to him.  Since WES&A did not establish, by a preponderance of the evidence, that Amerex was insolvent on September 19, 2007, or that Malino had reasonable cause to believe that Amerex was insolvent, it failed to show that Malino is liable to it under UFTA Section 117(B).

<u>Claims Against Capitoline</u>

WES&A neither alleged in the first amended complaint nor presented any evidence at trial that Capitoline had the actual intent to hinder, delay, or defraud any creditor of Amerex, as required by UFTA Section 116(A)(1).  Amerex's August 17, 2007 payment of $50,000 and September 19, 2007 payment of $50,000 to Capitoline represented fees and expenses Capitoline was owed in accordance with its contract with Amerex Companies, Inc.  Thus, the August 17 and September 19, 2007 payments to Capitoline are not subject to the "receiving a reasonably equivalent value in exchange for the transfer" provision of UFTA's Section 116(A)(2). Therefore, WES&A failed to establish, by a preponderance of the evidence, that Capitoline is liable to it under UFTA Section 116.  For the same reason, namely, that Amerex's August 17 and September 19, 2007 payments to Capitoline are contractually owed fees and expenses and not subject to the "receiving a reasonably

equivalent value in exchange for the transfer" requirement, under UFTA, WES&A failed to establish that Capitoline is liable to it under UFTA Section 117(A).

WES&A's contention, in the plaintiffs' post-trial submissions, that "[t]he parties stipulated that Amerex was insolvent in August and September 2007," is erroneous and rejected, as explained above.  WES&A presented no evidence showing the sum of Amerex's debts or all Amerex's assets, as defined by UFTA, or otherwise showing that Amerex was insolvent, on August 17 and September 19, 2007, for the purposes of the UFTA claim.  Moreover, WES&A is not entitled to a presumption of Amerex's insolvency.  Roever testified, credibly, that Capitoline was owed fees and expenses by Amerex Companies, Inc., and that in August and September 2007, when Amerex made payments to Capitoline, Amerex was in the best financial position since its inception, and Capitoline was paid only after Amerex satisfied its outstanding obligations to vendors, accountants, auditors and tax authorities.  WES&A did not establish, by a preponderance of the evidence, that Amerex was insolvent on August 17 and September 19, 2007, or that Capitoline had reasonable cause to believe that Amerex was insolvent.  Accordingly, WES&A failed to show that Capitoline is liable to it under UFTA Section 117(B).

The Court finds that WES&A failed to establish that Malino and Capitoline are liable to it under the Oklahoma UFTA claims.

### Oklahoma Law of Contribution

"When two or more persons become jointly or severally liable in tort for the same injury to . . . property . . . there is a right of contribution among them even though judgment has not been recovered against all or any of them."  Okla. Stat. tit. 12, § 832.  Having found no liability by the defendants to the plaintiffs, the plaintiff's derivative claim for contribution must be denied.

21

### *Declaratory Judgment*

"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  The express statutory language bars federal courts from rendering a declaratory judgment in a case of actual controversy with respect to federal tax liability.  Thus, the plaintiffs' request for a declaratory judgment against Roever and Malino for payment of tax arrears to the IRS is baseless.

The plaintiffs seek a "declaratory judgment that Defendants Roever and Malino are jointly and severally liable to the States of Oklahoma, Connecticut and Oregon for the assessed taxes and statutory additions of $54,969.88 stemming from unpaid taxes of Amerex, Inc. incurred in tax years 2006 and 2007 and the first 6 months of 2008, less any abatement granted by the State tax authorities."  "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  The Court finds that it is barred from rendering a declaratory judgment concerning the state-tax matters, including a determination of the amounts due and liability, since a declaratory judgment would have the same practical effect as an injunction.

Even if the Court is not barred by the Tax Injunction Act, federal courts have discretion in awarding declaratory relief.  See Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494, 62 S. Ct. 1173, 1175 (1942) ("Although the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act, . . . it was under no compulsion to exercise that jurisdiction.").  The Court refrains from exercising declaratory judgment jurisdiction in connection with the state-tax

matters at issue in this action.

## CONCLUSION

For the foregoing reasons, the Court finds that the plaintiffs failed to prove, by a

preponderance of the evidence, that they are entitled to the relief they seek in this action.  The Clerk

of Court is directed to enter judgment for the defendants.

Dated: New York, New York                     SO ORDERED:
        September 20, 2013

                                              _Kevin Nathaniel Fox_____
                                              KEVIN NATHANIEL FOX
                                              UNITED STATES MAGISTRATE JUDGE

23